Okay. Mr. Bates? Thank you, Your Honor. Good morning. May it please the Court. There is one main reason why the district court's order granting summary judgment in this case could be reversed, and that is that the district court resolved disputed facts in favor of the defendants, which is just not appropriate summary judgment. Furthermore, the district court abused its discretion in rejecting the party's prior settlement, which was reached in July of 2016 and would have provided nearly $9 million in cash and between $30 and $48 million in structural relief to the American Airlines retirement plan. I actually want to start, Your Honors, with the settlement. As Your Honors are aware, all lawsuits have risks, and all settlements take into account the party's valuations of those risks. And the 2016 settlement, the judgment for I have rejected, was reached after mediation that was provided over by a retired federal judge and would have provided nearly 20 percent of the plaintiff's total possible damages to the plan, which would have resulted in the trial court, the baggage handlers, the ticket counter employees, the ground crew, and the others who make up the participants in the American Airlines retirement plan. And in the Fifth Circuit, there are six factors for evaluating a settlement, and those factors are discussed on pages 35 and 36 of the appellant's opening brief. Judge McBride focused solely on the merits aspect of that analysis and rejected the party's settlement because the plaintiffs would prevail at trial and would get much more than the amount of the party's settlement. That's in the record at page 579. So you, so no good deed goes unpunished. I mean, he ruled in effect thinking that he was ruling in your favor, and you're complaining of that. That's exactly right, Judge Smith, and it's the dichotomy between the ruling on the party's settlement and the ruling on the merits of summary judgment years later that appellant's contempt constitutes an abuse of discretion. Judge McBride ruled, and this is in the record at 581, and I'm quoting now, the income the plan participants have lost by reason of the absence of a stable value fund option would appear to have been between $55 and $88 million. Based on the information provided to the court, if this action were to be pursued through litigation rather than by settlement, such an outcome would appear likely, end quote, and again, that's in the record at 581. Can I clarify? The district court said that the settlement, that he would not approve the settlement because he thought your clients could theoretically win a lot more. That's correct, Judge Ho. But both, as I understand it, both sides wanted the district court to approve the settlement? That's correct, Judge Ho. The defendants did not object or oppose the settlement at the time, and the only clarification I would make to your statement, Judge, Judge McBride not only found in 2016 that the plaintiffs could get much more, he found that they would. He said that it would appear likely that that was the outcome, not just that it was possible. Okay, so given that everybody wanted the settlement to be entered and approved, I understand your frustration, your client's frustration. I am curious what authority we would have to disrupt that aspect of the case, though, because I thought both parties agreed as part of the settlement that it would not take effect without the district court's approval. That is American Airlines' position, Judge Ho, and American cites to Section 2 of the settlement agreement, which is in the record at page 481, but that's actually not what the settlement agreement says. The settlement agreement only says that court approval is a condition of the settlement, and if this court were to conclude, and it should, that Judge McBride abused his discretion in rejecting the settlement and were to remand with instructions to approve the settlement, then court approval would happen, and the settlement would be effective. The agreement does not say that the agreement blows up if plaintiff's first motion for preliminary approval is denied. So is your point that that provision is a, I think you used the word condition, so it is a condition, but I take it your notion is it's a condition that is subject to court approval, which itself is subject to appellate review? Is that sort of the idea? Your Honor, Judge Ho, I would just say . . . Because you literally didn't get district court approval, obviously. True, but the agreement does not say that in the absence of court approval, there is no settlement. It just says in order for defendant's obligations to come into being, in order for a defendant to be obligated to pay the settlement amount, for example, one of the conditions for those obligations to come into effect is court approval, and court approval . . . But what's the difference? The whole point, you're here because you want those obligations to be enforced, so I'm not sure I understand how that helps you. Well, American Airlines is trying to place the condition of court approval in front of the settlement agreement, and appellant's position is that that condition can and should still be satisfied if this court were to remand and instruct the court to approve the settlement. Just because there wasn't court approval the first time does not mean there's no more agreement, and that's not what the agreement says. Okay. Any precedent on that, on that specific point that you would cite? No, Judge Ho, and I'll be . . . I will admit to you that this is an issue of first impression in this court. Have other circuits looked at this, or is this a new issue in the law? No, Judge Ho. We cited a Ninth Circuit case in our papers about an instance where the district court entered summary judgment after being informed that the parties had reached a settlement, and that was the closest situation that we could find that addresses this, and for the reasons that Judge Smith just stated, the reason why there's no authority on this is because it is so orthogonal. It is so unlikely that the court would reject a settlement because the court believed that the merits of the case were so strong, only to grant summary judgment on the merits four and a half years later. Your Honors, I want to turn now to the disputed facts that were resolved in favor of both standards, which is particularly important in cases like this one, which turn on issues of fiduciary breach under ERISA, which, as courts in this circuit have repeatedly noted, are necessarily fact-intensive. And those cases I'm referring to are Dunn v. West Oceanic and In re Enron, which are cited on pages 14 and 15 of Appellant's opening. And that is exactly the case here, and I want to briefly go through the disputed facts that the court resolved in favor of the defendants. And the first one is what the appropriate yardstick should have been for measuring the credit union option's performance. And again, the performance of the credit union option is what this case is all about. The default investment option in the American Airlines retirement plan, what was supposed to be the safest option in the plan, American Airlines chose to be the credit union option, which was essentially a dividend interest-bearing option on deposits that were held at the American Airlines Federal Credit Union. And the return on that investment during the class period was just 57 cents on every $100 the participants invested. But it was just an additional option, right? American Airlines is being criticized for offering an option that it didn't have to And that your clients later on had the option of changing, and they did not. I think that, Judge Smith, just to clarify, American, as the sponsor of the retirement plan, is required to have a capital preservation option. The statute says that there must be an option that is safe and designed to preserve capital. And that is, so American was required to include this option in the plan. I don't know that it is accurate to characterize it as an initial option. It is the safest option in the retirement plan. It's for individuals in the plan who want to make the most conservative investment possible. And our issue in this case is that American chose the wrong conservative investment option. There is another alternative out there, which is designed specifically for retirement plans, which is called a stable value fund. And with respect to whether stable value was the right investment option, the appellants say that American should have considered it, and American says that they did, and also that they didn't need to, because there were certain aspects of stable value that American believes now are too risky. And that itself is disputed. And plaintiffs— Well, for one thing, it wouldn't be federally insured, would it? No, Your Honor, it would not. And the option that was given was, in fact, completely federally insured. It was federally insured up to a deposit of $250,000. Your Honor, yes. And that's one of the characteristics, one of the factual differences between a credit union deposit and a stable value fund. And there is disputed evidence about whether or not American Airlines even considered whether or not the difference between a federal guarantee that Your Honor is talking about and a guarantee that's provided by contract by an insurance company is a meaningful difference, because stable value funds are also guaranteed in that way. The guarantee just comes from an insurance company contract rather than the federal government. And American Airlines made much of that distinction in their papers below and in their papers to this Court. But the bottom line is that distinction is not and has never been material. American Airlines experts talked at some length about the financial crisis and about how if the insurance companies had not been bailed out in the 2008 financial crisis, what impact that might have had on insurance company contracts, including stable value funds, that those insurance companies insured. But that concern never came to pass and has never come to pass. And the issue in ERISA, Your Honors, is about the process. It's about the process that American Airlines went through and plaintiffs submitted evidence, including the review of committee meeting minutes, that shows that American Airlines never considered that risk at the time. The distinction between the federal insurance that Your Honor was just talking about and the insurance company contract was raised for the first time in this litigation. And, Your Honors, similar disputed facts were resolved in favor of the credit union. And one in particular is whether the credit union had discretion over the plan's assets. Because, again, the assets that are at issue in this case are over $1 billion of planned participants' money, which was a material amount of money both for the participants and for the credit union. That amount of money, which was held every year by the credit union, represents 23 percent of the total deposits of the credit union. So it was a meaningful amount of money to the credit union. And plaintiffs argued below that because the credit union was holding those assets and had discretion over them, that it was a fiduciary and that it had committed a prohibited transaction in violation of ERISA. And that argument was raised below at 6501. And the trial court ignored three facts and drew them in favor of the credit union. One is that the prohibited transaction exemption that the credit union claims relieves it of liability only applies if it is a fiduciary. And two, that the credit union had control over investing that $1 billion and then deciding what interest rate would be provided to the participants. And that's raised in Appellant's opening brief at page 29. The second disputed fact that was resolved in favor of the credit union was whether the credit—was whether the interest rate was reasonable. Plaintiffs submitted expert testimony that concluded that the credit union's interest rate was, quote, not competitive and that the plan suffered $61 million in damages. And that's in the record at page 4878 at 79. And the trial court simply ignored that evidence. In my last two minutes, Your Honors, I want to address the standing issue. The trial court raised—the trial court concluded that plaintiffs lacked standing because they did not present evidence showing that they would have chosen a stable value fund if one were available. And that's in the record at 7358. But that is not a requirement of Article III standing. Plaintiffs introduced evidence below two measures of plaintiffs' individual damages. One being if their investment in the credit union option had been credited with the same interest rate that regular shares of the credit union have. And that was the case for part of the class period until the credit union changed its mind. And the second measure of damages plaintiffs presented were what their investment would have been worth if American had chosen a stable value fund and not the credit union option. And that's in the record at page 6931. Donovan v. Beardwood is one of the seminal ERISA decisions in this country, and it supports valuing plaintiffs' investment the way the plaintiffs described below. And I'm quoting now from Donovan, which is in the record at 6933, quote, where several alternative investment strategies were equally plausible. The court should presume that the funds would have been used in the most profitable of these. Burden of proving that the funds would have earned less than that amount is on the fiduciaries found to be a breach of their duty. Any doubt or ambiguity should be resolved against them, end quote. And the trial court rejected plaintiffs' first measure of damages because the trial court concluded that regular shares of the credit union and the credit union option, quote, had different characteristics. And that's in the record at 7363. And that is the exact weighing of disputed facts that is inappropriate summary judgment. Full v. U.S. Bank case, which I'll address briefly, actually supports appellant's argument, not American's. And it lays out the distinction between a defined benefit plan, a pension plan, and a defined contribution plan like this one. That's in the record at 6935. And I see my time at least initially has expired. Yes, you've saved time for rebuttal. Thank you. Thank you, Your Honor. Mr. Metlitsky. Thank you, Your Honor. May it please the court, Anton Metlitsky for American Airlines. My colleague, Mr. Nierman, is here for the credit union. I'll start with the merits if I could, and then I'll move to the settlement issue after that. As plaintiff's own evidence shows, most plan fiduciaries choose money market funds as a capital preservation option in the plan's investment lineup, either with or without stable value funds. Now, American has for years had the opportunity to choose something better. It's undisputed that the credit union option is safer than money market funds. In fact, it's risk-free. It's guaranteed by the federal government. And it's undisputed that the credit union option has outperformed money market funds during the relevant period. American, in other words, was able to offer its plan members as part of a broad, diversified investment lineup, a very popular, perfectly safe, perfectly liquid investment option that outperformed its closest peers. Yet plaintiff's position is that American violated its fiduciary duties by doing so and that the plan should have replaced the credit union option with a riskier, less liquid stable value fund because stable value funds have performed better over the relevant period. Plaintiff's lackstanding expressed that theory, which I'll discuss in a moment, but first I just want to explain briefly why their theory also fails on the merits as a matter of law on the undisputed facts. Will we find in the record support for what you just told us about which kinds of funds have outperformed the others? Oh, yes. That's totally undisputed that the credit union option has outperformed money market funds. Their expert concedes it. There's no question about that. And so the problem with their claim is that the logical consequence of their position is that the 60 to 70 percent of plan fiduciaries around the country who have chosen money market funds as a capital preservation option are breaching their fiduciary duties. After all, the credit union option, as I said, performs better with less risk than money market funds. So if it's a breach of fiduciary duty to retain the credit union option rather than a stable value fund, then it must be a breach of fiduciary duty to retain a money market fund rather than a stable value fund. But it can't be that the vast majority of plan fiduciaries around the country are in breach of their duty of prudence because the duty of prudence turns on how a reasonably prudent fiduciary would act in similar circumstances. So it makes very little sense to say that the overwhelming majority practice of plan fiduciaries around the country violates that duty. And so it's no surprise that every single court to have considered the question has rejected plaintiff's theory as a matter of law. We cite these cases at 43 and 44 of our brief. It's not a breach of fiduciary duty to retain a money market fund rather than a stable value fund. And so it can't possibly be a breach of fiduciary duty to retain the credit union option. And that makes sense not only based on actual fiduciary practice but also based on the underlying legal principles. As numerous courts have held, to prevail in a breach of fiduciary duty case based on poor performance. And again, my colleague just said performance of the credit union option is what this case is all about. That's right. And as numerous courts have held, if you're going to make a breach of fiduciary duty claim based on poor performance, you have to choose a comparable alternative. That is an alternative that's equivalent to the challenge investment other than performance. And you can't win a claim like this by proving that a riskier, less liquid investment performs better than a safer, more liquid investment. Of course that's true, but it doesn't tell you anything about which investment is better. And here it's undisputed that the stable value funds are riskier than the credit union option. Again, as Your Honor said, the credit union option is guaranteed by the government so it's risk-free. And stable value funds are less liquid than the credit union option. So the district court was quite right to hold that because plaintiff's claim is based on nothing more than the assertion that the credit union option was outperformed by a riskier, less liquid investment, their claim fails as a matter of law. Now, you know, for us that's sufficient to resolve the case. I know the court has to consider its own jurisdiction so I want to briefly discuss standing. Now, the plaintiff's original theory of this case was that the breach of fiduciary duty here was the failure to add a stable value fund as an option alongside the credit union option. But they clearly lied standing to bring that claim because, in fact, American offered a stable value fund option alongside the credit value option starting in 2015 and neither plaintiff took that option. So probably in response to that problem, they have since changed their claim. Now their claim is that the breach of fiduciary duty was simply to retain the credit union option at all. And so the standing problem here is now a little bit different. The standing problem here is that they have to demonstrate what would have happened in the but-for world to show that they were injured under Article 3. And their but-for world includes only a stable value fund, meaning that if anybody that wanted to stay in a capital preservation option in the but-for world would have chosen a stable value fund. But as I said earlier, their evidence, their own evidence demonstrates that most planned fiduciaries choose a money market fund either with a stable value fund option or without. So it's totally speculative to suggest that American would have chosen only a stable value fund option in the but-for world. And if both options were available to plan participants, there's no reason to think they would have chosen a stable value fund option. In fact, one of the plaintiffs here, when American added both a stable value fund and a money market fund in 2015, chose the money market fund. So those are the merits and standing points. Real quick on the settlement. I think there are three problems with the settlement. The first problem, Judge Ho, as you mentioned, is that the settlement included as a condition precedent that the district court approve the settlement. Now, my colleague says, well, this court could find that the failure to approve the settlement was an abuse of discretion, and then that condition precedent would subsequently be satisfied. But that doesn't make any sense. Or that it's subject to appellate review. Excuse me? Or that it's subject to appellate review. I don't hear you saying that there was an express waiver of appellate rights. It's not that the court lacks jurisdiction for anything like that. It's just that the benefit of the bargain for us was that we wouldn't have to litigate the claim for four years, even though we believed at the time that the claim... Well, but if that's what you wanted, then that does sound like a waiver of appellate review. But you didn't ask for that, and you didn't get one. Well, again, it's not a waiver of appellate review, because, for example, you know, there could have been other things that the plaintiff could have asked to review. I'm not sure. I can't think of something right now. Well, I guess what I'm trying to say, though, is if the condition precedent is district court approval, they might very well get it in the hypothetical world in which we reverse and send instructions under which the district court approves a settlement. Well, I don't think so, Your Honor, because the benefit of the bargain for us is that we wouldn't have to litigate the case, and so I think it would be an unreasonable construction of the contract to say that after we've had to litigate the case... You didn't set a deadline on this approval. It didn't say district court approval by date certain. No, it said that the district court approval was a condition precedent for the contract and it said that, I'll quote you the language, that disagreement shall terminate if and when any of the conditions specified in Section 2 is not satisfied. So when the district court disapproved... I'm sorry, so you're saying there was a time limit. Pardon my ignorance. Yeah, when the condition precedent wasn't satisfied, which it wasn't when the district court decided it wouldn't approve it, the settlement terminated, and that makes sense because, again, we would lose the benefit of the bargain if we had to pay for litigation for four years and then still settle a claim, and that brings me to the second problem, which is that there really isn't any cognizable injury here because, after all, they lost, right? So $8.8 million would have been a windfall for them. They're entitled to $0. The difference between this case... Well, but the cognizable injury is that they entered into a settlement agreement, a contract, essentially, that they had lost the benefit of. That's right. There's no actual injury because the district court didn't approve it. I'm talking about an injury now, right? Now their claim turns out to be meritless, so the settlement would have been a windfall for them. And then the third problem is that there wasn't any... I don't need to quibble with you. I don't really like the word windfall. The whole point of settlements is the sharing of risk between the parties. Absolutely, and that's exactly the point you're on. They shared the risk of losing, right? They might have lost, and we would have had to litigate the claim for four years. And we actually did have to litigate the claim for four years, so that's why we lost the benefit of the bargain of the settlement, which is why it's not that the court doesn't have jurisdiction to review. It's that there isn't any effective remedy that the court can issue now because there isn't any settlement agreement any longer to enforce. And the third point is just that the district court was totally reasonable in failing to approve the settlement. What the district court told the plaintiffs was that, look, if you want me to approve a settlement that compromises your claim by something like 90%, explain to me what you've been telling me that you've investigated this claim that you're going to win. And I believe you if you're right. You're telling me you're going to win. This was at the pleading stage. Tell me why this kind of compromise is fair to bind your absent class members. And in response, they filed an affidavit. It's a Docket 71, starting at 880 of the appellate record, which again just goes through the merits of the claim, how good the merits of the claim are, and in fact they're even better now because they've interviewed American employees. But the very last paragraph says, despite our investigation and despite the fact that we think our claim is meritorious, we just went through a mediation, and though we were, quote, underwhelmed with parts of that mediation, we think that this is an opportunity to get out of litigation early. But why is that an imminently reasonable statement that any plaintiff would put forth? They believe in their claims, but they're willing to settle. Nobody wants to talk down their claims as part of negotiation. Because this is a class settlement, and it's not just that they're willing to settle. It's got to be fair to bind absent class members. Right, but isn't it implicit that they believe in their claims, but there's always a risk of not predicting what a district court will do or an appellate court will do? Your Honor, they have to explain to the district court what they believe they have. And what they should have said, I think, is that since they filed this action, every court to have considered a similar claim had rejected it as a matter of law. And so even though they believe in their claim and they think it's meritorious, there was substantial legal risk. But they didn't say that. And so the district court was well within its discretion to decide that it wasn't going to approve the settlement. Is this essentially disrespecting the mediator? Your agreement was essentially proximate to the mediator's. That's right. So why isn't that presumptively reasonable? What a mediator—I forget, I think it was a former federal judge. I don't think there's any presumption. I don't mean a doctrinal one, but how is it— Well, look, we agreed to the settlement, right? Right. We didn't challenge the settlement. But the district court imposed on them the obligation to demonstrate to him that it was reasonable to bind absent class members. That's totally normal. That's what Rule 23E requires. And they just would not do what he asked them to do, which is explain to them why such a steep discount was reasonable to bind when absent class members are going to be bound. The district court was not satisfied with their answer. Is your argument essentially a forfeiture argument, that they could have presumably defended the mediator's intelligence in reaching this, but failed to and therefore forfeited it? Or that they could not possibly have met their burden? Oh, no, no. I mean, they of course could have. I think they could have satisfied their burden. It's an abusive discretion standard. I don't think it would have been an abusive discretion for the district court to approve the settlement, especially if they had given him more information. Our point is that he didn't abuse his discretion. But it's a forfeiture argument, essentially, is what you're making. They forfeited their right. I think you can characterize it that way. I'm not sure that's exactly the way I would characterize it. But that's fine with us. And it certainly can't be that the fact that they had told the district court at the time that they were going to prevail, and then when the evidence came out, it turned out that they were wrong on the merits, that that somehow undermines the previous decision not to approve the settlement. And there is a case on that from this court, Bates v. Ford Motor Company, which we cite in our brief, if the court has no further questions. All right. Thank you, Mr. McNichol. Thank you, Your Honor. Good morning, Your Honors. And may it please the Court. My name is Jonathan Nehrman, and I'm here on behalf of the American Airlines Federal Credit Union. The credit union is a member-owned, non-profit credit union    that provides traditional banking services to thousands of employees and family members of American Airlines. While the gravamen of the appellant's complaint against American Airlines is that the dividend rate offered through the credit union option was too low relative to other comparable investment products, the appellants have alleged a separate and legally distinct cause of action against the credit union for violations of the prohibited transaction rules of ERISA. We ask that this court affirm the district court's decision below for three reasons. First, plaintiffs' attempt to confer fiduciary status on the credit union through an exemption of the prohibited transaction rules lacks any textual support. A clear reading of the statute requires that a court make a predicate finding that the credit union be a fiduciary before that exemption even applies. Therefore, the appellants are putting the cart before the horse and trying to reverse-engineer the conference of fiduciary status. Furthermore, the courts have made clear that a bank's mere holding of planned assets does not confer fiduciary status. This court has made such a ruling in Wood v. CNA, and other courts and other circuits around the country have held similarly. Even if this court were to engage in a functional fiduciary analysis, as the district court did below, the court would reach the same decision, and that is the credit union was not a named fiduciary and the actions it took with respect to the planned deposits that it held did not create a functional fiduciary requirement for the credit union. Second, as a matter of law, the credit union did not deal with planned assets for its own benefit. The credit union did not act with discretion with respect to the planned assets. The credit union held American Airline planned assets as deposits in the normal course of conducting credit union business. The case law makes clear that when a bank, or in this case a credit union, takes possession of a deposit, the bank or the credit union holds on its books a liability, a debt that is owed back to the depositor, in this case the plan, and the bank or the credit union can use the planned deposits again in the normal course of its business. The appellants have mischaracterized in this case, both below and to this court, how credit unions hold planned deposits, how they generate income from those deposits, the dividend rate setting process, and how the credit union pays those dividends to its members. These are all non-fiduciary functions that again are normal in the course of credit union business. It's also important for this court to recognize it is undisputed that the credit union paid every month the dividend rate that it proposed the previous month. And finally, Your Honor, there is a third and independent reason that we believe that you can affirm the court's decision of dismissal below, and that is on the basis of standing. Again, this court needs to make a separate jurisdictional review of the record, and it is clear by plaintiff's own admission that the only injury that they sustain purportedly is the difference between what they would have received if American Airlines had put a different option in the plan and what they did receive. That theory of injury and the damages that flow from it are completely untethered from the sole legal claim of a prohibited transaction that they alleged against the credit union. And unless the court has any questions for me, I will get back to balancing my time. Thank you, Mr. Newman. Mr. Bates, you saved time for a vote. Thank you, Your Honor. I want to start with my colleague's statements about the settlement. Mr. Mitlitsky talked about the benefit of the bargain for American Airlines and how if this court were to remand with instructions that would lead the district to approve the settlement, that would destroy the benefit of the bargain for defendants. To have it otherwise, and to consider that otherwise, would be to ignore the benefit of the bargain for the plaintiffs. Plaintiffs would not get a windfall, I think Judge Smith, as you mentioned, because they agreed to compromise their claims for a percentage less than their total damages at the time. And now the benefit of that bargain has been taken away by the court's inconsistent rulings on the merits of the case. Can you respond to their suggestion that you could have defended the settlement but simply failed to do so? I think that's a mischaracterization of the record below, Judge Ho, by counsel for American Airlines. Plaintiffs did respond to multiple rounds of supplemental briefing and submitted declarations from the retired federal judge who mediated the settlement, declarations from experts, declarations from counsel, and again, I think while technically true that all of the supplemental material that was provided to the district court was technically provided by plaintiffs, that information was provided jointly by the defendants and plaintiffs who at the time were both laboring to ensure that the settlement would be approved. Plaintiffs took confirmatory discovery after the settlement from defendants which was incorporated into plaintiffs' presentations. What was . . . you said it was all submitted. The bottom line is that the trial judge challenged the adequacy of the amounts in the settlement. Like with lots of settlements that a judge has to prove, they don't just approve it just because somebody puts it up there. He deemed it a duty to determine if it was adequate. Counsel opposite says you didn't respond to the adequacy question. I just heard you say about the deficits and all that but just tell me straightforwardly if Judge McBride was saying the amount in the settlement was inadequate, what was the response? Don't tell me that there were depositions presented. I mean what was the response qualitatively to the adequacy? Judge Stewart, the response below was that there is substantial risk for the plaintiffs in moving forward and that included the risk of class certification and it included the risk of summary judgment. Well, I get that but it seemed to me he was questioning the amount. That the amount being put forth in the settlement from his vantage point was significantly lower than even the best guess. So he says, no, I'm not approving it. What did you do, not you personally, to satisfy the judge or otherwise say this is the best there is or whatever in a dollar amount? We did several things, Judge Stewart. Again, as I mentioned, we put in supplemental material to the trial court explaining both the . . . What was the nature of that? Was that from financial people or from fund information? I mean what was that? What was the quality of what you submitted? I mean was it monetary fund information? It was. The information came in the form of declarations from plaintiffs' counsel and from the mediator and a condition of the settlement was that an independent fiduciary would approve the structural changes that were made to the plan. So while independent expert testimony was not presented at preliminary approval, a third party expert was explicitly going to be brought in to preside over and approve the structural relief contemplated by the settlement. Well, there's four years gap here. Tell me, in this interim where he doesn't approve it and there's all this time, did you have a remedy, not this appellate review where you're here, you're here on appeal now because it's gone to the merits. Was there an avenue to you to enforce something like mandamus, for example, for us to order the trial judge to approve it? Did you have an appellate remedy, not this appeal on the merits, but look, we presented this to the judge, we've given this other information, he won't approve it, come to the Fifth Circuit with an injunction or some other remedy to make him approve. Was that available or was your only option to play the deck out, you lose, and now be here to approve it? Do you follow me? I do, Judge Seward, and I'll say two things. One, that issue was not raised below, and so I'd be happy to submit a 28-J letter on that if Your Honor would like us to, but my initial thought is that the appellate remedy was not available, and so until there was a final judgment, no, plaintiffs did not have an appellate remedy at that time. And in response to your question about what did plaintiffs do, we took the judge's comments about the settlement to heart and we began to litigate the case in earnest because the judge told us four and a half years ago that he believed that we would prevail on the merits, and so we endeavored to do that over the next four and a half years. Do you want to quickly respond to the opposing counsel's point that none of this matters because the settlement agreement is now expired? I would briefly, Judge Ho, thank you, and I would just say again that if the court looks at the plain language of the settlement agreement, it does not say that the agreement dissolves as soon as one condition is not met. The parties both . . . No, no, no, I'm talking about the time deadline. I understand there was a specific deadline or effective date or expiration date, I should say. Is that . . . Judge Ho, there's nothing in the settlement agreement that says if these conditions are not met by this date, the agreement dissolves. There's no time constraint like that in the agreement. Unless Your Honor has other questions. Yes, thank you. Your time has expired and your case and both of today's cases are under submission and the court is in recess. Thank you, Your Honor.